UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| VANCE TRAHAN | CIVIL ACTION |
| VERSUS | NO: 09-6830 |
| CROWN DRILLING, INC., ET AL. | SECTION: "S"(4) |

## REPORT AND RECOMMENDATION

On January 31, 2011, the presiding Judge granted the **Plaintiffs' Motion for Default Judgment (R. Doc. 9)** and referred the matter to the undersigned for a Report and Recommendation regarding the Plaintiff's damages. (R. Doc. 25.) On Wednesday, April 20, 2011, the undersigned held an evidentiary hearing on damages and took the matter under submission. (R. Doc. 32.)

### I.     Background

On October 15, 2009, the above captioned matter was removed to the Eastern District of Louisiana. (R. Doc. 1.) In his Complaint, the Plaintiff, Vance Trahan, contends that he was employed by the Defendant, Crown Drilling, Inc. from January 2007 through May 24, 2007. Trahan was employed as a floor hand on a drilling rig. During his employment, he contends that he was subjected to unlawful same sex harassment in violation of La. R.S. 23:303 and Title VII by his supervisor, Keith Ebarb. Trahan filed his Complaint seeking damages from both Crown Drilling, Inc. and Keith Ebarb. On January 31, 2011, the Plaintiff's motion for Default Judgment was granted

by the presiding Judge. (R. Doc. 25.) The matter was referred to the undersigned for a Report and Recommendation on damages. *Id.*

On April 20, 2011, the undersigned held an evidentiary hearing regarding the Plaintiff's claims against Ebarb. Trahan testified that the following actions occurred during his final two months of employment, specifically from April 2007, through May 24, 2007.

Trahan testified that he had a bleeding ulcer in his colon which would "free-flow" blood when he would bend over. The blood was visible from his clothing. Ebarb, who noticed Trahan's condition, made comments that the bleeding was caused by the Plaintiff's "boyfriend" and that it would stop if he placed a cork in his rear end. Ebarb also suggested that he would place his "pecker" in the Plaintiff's rear end to stop the bleeding.

Trahan further testified that Ebarb would physically assault him by performing "nut checks" which the Plaintiff described as a process whereby the Defendant slapped the Plaintiff's testicles with an open handed punch. Trahan testified that these "nut checks" were so painful that they often made him keel over in pain and even cry. Trahan further testified that Ebarb would perform "nut checks" on the Plaintiff and the rest of the crew about 10 to 12 times a day, or at least once or twice an hour.

Trahan further testified that Ebarb would take tampons dipped in transmission oil and throw them at him while he walked on the catwalk. This would occur about twenty (20) times a week.

Further, as part of Trahan's employment, he was responsible to work "lead tongs." While Trahan worked this position, it was necessary for the chain to have extra slack. Ebarb would take the chain and tighten it, causing the tongs to stop short and cause Trahan to propel forward. As a result of these actions, Trahan suffered bruised ribs and a "busted lip." Trahan testified that Ebarb

would tighten the chains about two times per day.

Trahan testified that Ebarb's actions were so egregious that it put him on the verge of suicide. Trahan was so emotionally distraught that his wife divorced him and refused to let him see their son for a period of two (2) years. His ex-wife felt that Trahan's suicidal tendencies put their son in danger. Due to his emotional state, Trahan contends he was forced to quit his job on May 24, 2007.

After his wife left him, Trahan moved in with his father due to his emotional state. For the first year he lived with his father, he did not leave the house. His father eventually gave Trahan a pair of rabbits to take care of. This helped Trahan recover from his state of emotional distress because taking care of the rabbits helped ease his pain.

Trahan contends that his total damages include $57,720.00[1] in lost wages and $8,571.00 in attorneys' fees. His Complaint also seeks damages for emotional distress. Specifically, Trahan testified that he was paid a regular hourly rate of $12.00 and an hourly rate of $18.00 for overtime. Further, he received $80.00 a day per diem from his employer. His paychecks fluctuated because he would work a six day "shift" followed by a three day "shift." They also fluctuated depending on the amount of overtime work performed.

Trahan testified that his paychecks ranged from $1,000.00 to $1,200.00. He was paid bi-weekly and made between $2,000.00 to $2,400.00 a month in wages. He attempted to go back to work after Ebarb's sexual harassment but found himself so frightened that in December 2007, he quit for a second time. Trahan contends that he was out of employment from December 2007 through April 2009. In his Brief in Support of Attorney's Fees and Plaintiff's Lost Wages (*See* R. Doc. 34), the Plaintiff contends that he was out of work for approximately 52 weeks.

---

[1]This figure reflects $18,720.00 in per diem wages and $39,000.00 in hourly wages.

During the hearing, Trahan submitted his new hire form which reflects that his rate of pay was $12.00 per hour in support of his damages. He also submitted two paychecks which are representative of the range of payment he received depending on if he worked the six day "shift" or the three day "shift." The first paycheck, for the pay period of March 14, 2007, through March 27, 2007, reflects a total gross pay of $1,272.00 and a total net pay of $1,018.11. During this payment period, he worked 40 hours at his regular hourly rate of $12.00 and worked 44 hours of overtime at his overtime rate of $18.00. The second paycheck, for the pay period of March 28, 2007, through April 10, 2007, reflects a total gross pay of $1,572.00 and a total net pay of $1,235.76. During this payment period, he worked 80 hours at his regular hourly rate of $12.00 and worked 34 hours at his overtime rate of $18.00.

**II.     Analysis**

    **A.     Wage Damages**

As an initial matter, the Court notes that although Trahan testified that he was out of work from December 2007 through April 2009, his Brief in Support of Attorney's Fees and Plaintiff's Lost Wages (R. Doc. 34) indicates that he was out of work for approximately 52 weeks. However, a calculation from December 1, 2007 through April 1, 2009, results in a period of approximately 69 weeks. In light of the Plaintiff's written submission requesting compensation for 52 weeks of unemployment, the Court will utilize this figure in making its determination.

On the same note, the Court notes that Trahan testified that he was paid between $1,000.00 to $1,200.00 bi-weekly. However, Trahan's paychecks reveal that these figures represent Trahan's net pay as opposed to his gross pay. Trahan's gross pay is the appropriate measure for the Plaintiff's damages for loss of wages.

Trahan's paychecks reveal that his gross pay ranged from $1,272.00 to $1,572.00. The Court finds that the two paychecks submitted, which total $2,844.00, is the appropriate figure in which to measure the Plaintiff's monthly wages. In his 52 week period of unemployment, therefore, he lost approximately $36,972.00.[2]

As to the Plaintiff's per diem wages of $80.00, although there is no written documentation reflecting these payments, the Court finds that Trahan's testimony was credible. Further, Trahan requests $18,720.00 in lost per diem wages during this 52 week period. This request reflects per diem for a period of 234 days. Therefore, Trahan did not request per diem for 130 days of this 52 week period. The Court therefore finds this request reasonable, and recommends that the Plaintiff be awarded $18,720.00 in per diem wages.

As a result, the Court finds that the Plaintiff's total damages in lost wages for his 52 week period of unemployment is **$55,692.00**.

B.     **Attorneys' Fees**

Trahan seeks to recover a total of $8,571.00 in attorney's fees in the instant matter. In support, he provides a "Statement of Professional Services Rendered" (R. Doc. 34-1) and affidavits of Michelle Lavergne and L. Clayton Burgess (R. Doc. 36), the paralegal and attorney responsible for handling the above captioned matter.

The Supreme Court has indicated that the "lodestar" calculation is the "most useful starting point" for determining the award of attorney's fees.[3] *Hensley v. Eckerhart*, 461 U.S. 424, 433

---

[2] A period of 52 weeks, measured by bi-weekly pay periods, results in 13 months. This figure arises from taking 13 months and multiplying it by the Plaintiff's representative monthly wage of $2,844.00.

[3] Although in cases sitting in diversity jurisdiction, as is the case in the instant matter, state law governs the substantive questions of the award and reasonableness of attorney's fees, *see Alyeska Pipeline Servs. Co. v. Wilderness Soc'y*, 421 U.S. 240, 259 n. 31 (1975); *Mathis v. Exxon Corp.*, 302 F.3d 448, 461 (5th Cir. 2002), the instant motion relates to an award of sanctions, in the form of attorney's fees, pursuant to Federal Rule of Civil Procedure 37.

(1983). The lodestar equals "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Id.* The lodestar is presumed to yield a reasonable fee. *La. Power & Light Co. v. Kellstrom*, 50 F.3d 319, 324 (5th Cir. 1995). After determining the lodestar, the court must then consider the applicability and weight of the twelve factors set forth in *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974)[4]. The court can make upward or downward adjustments to the lodestar figure if the *Johnson* factors warrant such modifications. *See Watkins v. Fordice*, 7 F.3d 453 (5th Cir. 1993). However, the lodestar should be modified only in exceptional cases. *Id.*

After the calculation of the lodestar, the burden then shifts to the party opposing the fee to contest the reasonableness of the hourly rate requested or the reasonableness of the hours expended "by affidavit or brief with sufficient specificity to give fee applicants notice" of the objections. *Rode v. Dellarciprete*, 892 F.2d 1177, 1183 (3d Cir. 1990).

### 1. **Reasonableness of Billing Rate**

Attorney's fees must be calculated at the "prevailing market rates in the relevant community for similar services by attorneys of reasonably comparable skills, experience, and reputation." *Blum v. Stenson*, 465 U.S. 886, 895 (1984). The applicant bears the burden of producing satisfactory evidence that the requested rate is aligned with prevailing market rates. *See NAACP v. City of Evergreen,* 812 F.2d 1332, 1338 (11th Cir. 1987). Satisfactory evidence of the reasonableness of

---

Therefore, the Court will analyze the proposed award of attorney's fees pursuant to the Federal standard.

[4] The twelve *Johnson* factors are (1) the time and labor involved; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal services properly; (4) the preclusion of other employment by the attorney due to this case; (5) the customary fee; (6) whether fee is fixed or contingent; (7) time limitations; (8) the amount involved and results obtained; (9) the experience, reputation and ability of counsel; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *See Johnson*, 488 F.2d at 717-19.

the rate necessarily includes an affidavit of the attorney performing the work and information of rates actually billed and paid in similar lawsuits. *Blum*, 465 U.S. at 896 n.11. However, mere testimony that a given fee is reasonable is not satisfactory evidence of a market rate. *See Hensley*, 461 U.S. at 439 n.15.

Rates may be adduced through direct or opinion evidence as to what local attorneys charge under similar circumstances. The weight to be given to the opinion evidence is affected by the detail contained in the testimony on matters such as similarity of skill, reputation, experience, similarity of case and client, and breadth of the sample of which the expert has knowledge. *Norman v. Hous. Auth. of City of Montgomery*, 836 F.2d 1292 (11th Cir. 1988); *see also White v. Imperial Adjustment Corp.*, No. 99-03804, 2005 WL 1578810, at *8 (E.D. La. Jun. 28, 2005) (recognizing that attorneys customarily charge their highest rates only for trial work, and lower rates should be charged for routine work requiring less extraordinary skill and experience).

Here, Michelle Lavergne, the paralegal who rendered services on the instant matter, attests that she has been employed with the firm of L. Clayton Burgess since 2000. In 2002, she attended Remington College and received a paralegal associate's degree in 2002. Her hourly rate is $50.00. (R. Doc. 36, p. 1.) L. Clayton Burgess attests that he graduated from Louisiana State University Law School in 1994 and has been licensed to practice in the State of Louisiana since 1994 and the State of Texas since 2001. He practices law in primarily personal injury, employment law, and maritime law. His hourly rate is $200.00 per hour. (R. Doc. 36, p. 2.)

Where "an attorney's customary billing rate is the rate at which the attorney requests the lodestar to be computed and that rate is within the range of prevailing market rates, the court should consider this rate when fixing the hourly rate to be allowed. When that rate is not contested, it is

*prima facie* reasonable." *La. Power & Light*, 50 F.3d at 328.  The Court notes that there has been no challenge to the reasonableness of the rates charged by either Lavergne or Burgess.  Therefore, the Court finds that the rates charged are reasonable.

### 2. **Determining the Reasonable Hours Expended**

The party seeking attorney's fees bears the burden of establishing the reasonableness of the fees by submitting adequate documentation and time records of the hours reasonably expended and proving the exercise of "billing judgment."  *Wegner v. Standard Ins. Co.*, 129 F.3d 814, 822 (5th Cir.1997); *Walker,* 99 F.3d at 770.  Attorneys must exercise "billing judgment" by excluding time that is unproductive, excessive, duplicative, or inadequately documented when seeking fee awards.  *Id.*  (*citing Walker v. United States Dep't of Housing & Urban Dev.,* 99 F.3d 761, 769 (5th Cir.1996)).  Specifically, the party seeking the award must show all hours actually expended on the case but not included in the fee request.  *Leroy v. City of Houston*, 831 F.2d 576, 585 (5th Cir. 1987).  Hours that are not properly billed to one's client also are not properly billed to one's adversary.  *Hensley*, 461 U.S. at 434.  The remedy for failing to exercise billing judgment is to reduce the hours awarded as a percentage and exclude hours that were not reasonably expended.  *Id.*  Alternatively, this Court can conduct a line-by-line analysis of the time report.  *See Green v. Administrators of the Tulane Educational Fund*, 284 F.3d 642 (5th Cir. 2002).

The Plaintiff contends that his attorney expended 39.13 hours and that the paralegal expended 14.90 hours in handling the above captioned matter.  In reviewing the "Statement of Professional Services Rendered," the Court notes that there is no indication that the Plaintiff's counsel exercised billing judgment.  Counsel did not exclude any time that was unproductive, duplicative, or inadequately document.  To the contrary, the document reflects several billing entries

for administrative tasks.

To recover for paralegal fees, the services rendered by the paralegal must be legal in nature, or work traditionally performed by an attorney. *Jones v. Armstrong Cork Co.,* 630 F.2d 324, 325, n. 1 (5th Cir.1980). Work that is legal in nature includes factual investigation, locating and interviewing witnesses, assisting in discovery, compiling statistical and financial data, checking legal citations, and drafting correspondence. *Missouri v. Jenkins,* 491 U.S. 274, 288 (1989). Legal activities undertaken by paralegals must be distinguished from activities that are clerical or secretarial in nature, including typing, copying, or delivering pleadings. *Id.* Clerical and secretarial tasks cannot be billed at paralegal rates. *Id.*

Here, several of Lavergne's entries include tasks which are administrative in nature. For example, several entries relate to copying and sending letters or calendaring deadlines. The Court finds that a total of 1.8 hours billed by Lavergne are inappropriate as they are administrative in nature.[5] Therefore, the Court reduces the hours billed by Lavergne from 14.90 hours to 13.80 hours.

Burgess also includes some billing entries which are more reflective of administrative tasks

---

[5]The Court is specifically disallowing the following entries by Lavergne:
06/04/07–"Copied and sent out letter to Andy Simon w/ Crown Drilling"–.05; Calendared deadline to return documents to EEOC"–.05; 10/08/07–"Copied and mailed out letter to client"; 05/19/08–"Copied, faxed & mailed petition"–.05; 08/17/08–"copied & mailed letter to clerk"–.05; 08/04/08–"copied and mailed letter to clerk"–.05; 09/17/2008–"copied letter & discovery & mailed to client"–.05; 06/17/09–"calendared deadline to file federal claims"–.05; 03/24/10–Calendared deadline to file memo"–.05; "03/31/10–Scanned & emailed Affidavit to clerk"–.20; 04/27/10–"calendared rule 16 scheduling conference"–.05; 05/07/10–"faxed letter to magistrate and copied Andrishok"–.05; 05/24/10–"Calendared all dates contained in scheduling order"–.40; 05/26/10–"copied and mailed letter to client"–.05; 05/26/10–"Calendared dates regarding settlement conference"–05; 08/09/10–Calendared deposition–.05; 09/20/10–"copied & mailed letter to client"–.05; 09/24/10 "faxed letter to Andrishok" –.05; 11/08/10–Calendared new date for hearing–.05; 11/08/10–"Calendared new time for hearing"–.05; 11/09/10–"Copied, faxed & mailed letter & settlement documents to Andrishok"–.05; 11/10/10–"copied * mailed letter to client"–.05; 03/04/11–"calendared telephoned status conference"–.05; 03/29/11–"calendared hearing date for 4/20/11–.05; 04/01/11–"received email that email was rejected"–.05.

In addition, the 09/25/08 billing entry by Lavergne which reads "Prepared letter & faxed to Andrishok confirming extension granted to respond to discovery" contains both tasks that are properly billed and the administrative task of faxing. As such, the Court reduces this entry by .05 hours.

than those that are legal in nature. The Court finds that a total of .23 hours billed by Burgess were therefore improperly included and therefore reduces his total recoverable hours to 38.9 hours.[6]

### 3. Adjusting the Lodestar

As indicated above, after the lodestar is determined, the Court may then adjust the lodestar upward or downward depending on the twelve factors set forth in *Johnson v. Ga. Highway Express, Inc.,* 488 F.2d 714, 717-19 (5th Cir. 1974). To the extent that any *Johnson* factors are subsumed in the lodestar, they should not be reconsidered when determining whether an adjustment to the lodestar is required. *Migis v. Pearle Vision, Inc.,* 135 F.3d 1041, 1047 (5th Cir. 1998). The Court has carefully considered the *Johnson* factors and concluded that they do not warrant an upward or downward departure here. Having considered each of the lodestar factors in this matter, the Court finds that an adjustment upward is not warranted.

Therefore, the Court finds that the total amount recoverable for Lavergne's fees is $690.00 and the total amount recoverable for Burgess's fees is $7,780.00. As such, the Court recommends that Trahan recover a total of **$8,470.00** in attorneys fees in the above captioned matter.

### C. Pain and Suffering

In his Complaint, the Plaintiff generally seeks damages for: "1. severe mental and emotional distress and psychological damage; 2. loss of self esteem; and 3. loss of freedom of movement and

---

[6]The billing entries disallowed by the Court are as follows:
08/26/08–"Received mailed copy of answer"–.05; 09/10/08–"Received mailed copy of discovery request"–.05; 09/25/08–"Received letter in mail which was faxed from Andrishok"–.01; 09/30/08–"Received letter in mail which was faxed by Andrishok"–.01; 08/10/08–"Received mailed copy of letter & notice of deposition"–.05; and "08/10/10–"Received letter faxed to our office on 08/09/10"–.01.

In addition, Burgess's 11/17/10 billing entry which states "Prepared & sent fax to Magistrate Roby informing case settled against Crown Drilling & Keith Ebarb only person left & no need for settlement conference & copied Andrishok" contains both tasks that are properly billed and the administrative task of faxing. As such, the Court reduces this entry by .05 hours.

security." (R. Doc. 1-1, ¶ 15, Compl.) In hearing the evidence at the hearing, the Court notes that Trahan testified that he became suicidal as a result of Ebarb's actions. His suicidal tendencies frightened his wife to the extent that she left him and moved to Dallas, Texas, taking their young son with him and refusing to allow him to see his only son. Thereafter, Trahan moved in with his father, where he refused to leave his room for a year. The Plaintiff recently began to emotionally recover after receiving two rabbits as a present from his father. The Plaintiff testified that having something to take care of helped ease his pain.

The Court finds the Plaintiff's testimony as to his emotional state credible. The Plaintiff, who already suffered from an embarrassing medical condition in which his colon bled profusely, was subjected to tormenting sexual harassment and at times, physical assault at the hands of Ebarb. The testimony demonstrates that Ebarb's actions were frequent and pervasive. The Court is satisfied that Trahan did in fact suffer emotional distress as a result of Ebarb's harassment, and this distress was extreme such that Trahan became suicidal. Further, as a result of the sexual harassment, the Plaintiff lost the ability to work, and ultimately lost his family. As such, the Court finds that an award of **$35,568.00** for emotional pain and suffering is appropriate in this matter.

## IV.     Conclusion

Accordingly,

**IT IS RECOMMENDED** that the Plaintiff, Vance Trahan, be awarded $55,962.00 in lost wages, $8,470.00 in attorneys' fees, and $35,568.00 for emotional damages for a total recovery of **$100,000.00** from the Defendant, Keith Ebarb.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation **within fourteen (14) days** after

being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. *Douglass v. United Servs. Auto. Ass'n.*, 79 F.3d 1415, 1430 (5th Cir. 1996).[7]

New Orleans, Louisiana, this 13th day of July 2011

**KAREN WELLS ROBY**
**UNITED STATES MAGISTRATE JUDGE**

---

[7]*Douglass* referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend the period to fourteen days.